Patrick J. Picariello, J.
Plaintiff sues in Small Claims Part for a refund of tuition paid by him for his son’s attendance for the spring term in the defendant school, which term had been regularly scheduled to terminate on May 30, 1970.
*227 Classes were suspended on May 6, 1970, and then canceled for the balance of the semester. Nineteen days of instruction time were thus lost to plaintiff’s son. Plaintiff now seeks to recover the proportionate share of said tuition paid by him therefor, amounting to $277.40.
It is undisputed, and the court supposes common knowledge, that the action of the defendant in first suspending and then canceling the balance of the semester was precipitated by riots, disorders, and acts of vandalism occurring on its campuses. Also, there was no testimony or other evidence that plaintiff’s son participated, directly or indirectly, passively or actively, in any wise in such conduct or acts.
The defendant points out that, under the statute applicable to private education institutions, the board of trustees is empowered to ‘‘ use * * * its property as they shall deem for the best interests of the institution ’ ’; and further to ‘ ‘ make all * * * rules necessary and proper for the purposes of the institution and not inconsistent with law or any rule of the university ” (Education Law, § 226, subds. 6, 10).
Under such circumstances classes were suspended by order of the defendant’s president on May 5, 1970, pending a review by defendant’s senate and faculties. Resolutions were passed at a meeting of the senate 2 days later, enabling each school to make its own regulations concerning examinations and guides for the remainder of the semester. The senate further recommended to faculties that they suspend classes for the remainder of the semester. Resolutions affording students, including plaintiff’s son, various options with respect to the grading of their work for the entire semester were then provided. Formal classes were neither scheduled nor conducted, although the faculty continued in attendance, available for consultation.
It is most interesting and significant to note that representation of the student body in the defendant’s senate was conspicuous by its absence. (With apologies to Lord John Russell in a speech to the Electors of the City of London April, 1859.) (Ch. 3, § 31, of the defendant’s charter and by-laws.)
This latest circumstance, combined with the distressing and appalling situation then pertaining on the defendant’s campuses, impels the court to inquire whether the senate action reflects a condition of its isolation from environmental influences then existing, indifference to its legal obligations to the student body as a whole and to its moral responsibility to society.
Let us now examine the power of defendant’s board of trustees to ‘ ‘ use * * * its property as they shall deem for the best interests of the institution ”.
*228 Universities are schools of education and schools of research. The primary reason for their existence is not to he found either in the mere knowledge conveyed to the students or in the mere opportunities for research afforded to the members of the faculty. No university has any justification for existence for the imparting of information. The justification for a university is that it preserves connection between knowledge and the zest of life, by uniting the young and the old in the imaginative consideration of learning. The university imparts information, but it imparts it imaginatively. At least this is the function which it should perform for society. A university which fails in this respect has no reason for existence. This atmosphere of excitement, arising from imaginative consideration, transforms knowledge (Professor A. N. Whitehead in “ The Aims of Education”). Education has for its object the formation of character. (“ Social Status ”, pt. 11, ch. 17, § 4.) For education makes a people easy to lead but difficult to drive; easy to govern, but impossible to enslave.
Youth is imaginative, and if the imagination be strengthened by discipline, this energy of imagination can in great measure be preserved through life. It appears that the tragedy today is that those who are imaginative have but slight experience, and those who are experienced have feeble imaginations. Students act on imagination without knowledge; pedants act on knowledge without imagination. A liberal pedant has been described as unfit, a moderate is viewed with scepticism, and a stern one is regarded as an authoritarian. Indeed, the task of a university is to weld together imagination and experience.
Unfortunately, there are administrators who, if we are to judge their purpose by their conduct, see treason „in all dissidence and would welcome an era in which all of us should think, feel and live in consonnance with duly prescribed patterns. However, facades of authority, however imposing, do not survive after it has appeared that they rest upon sands of conjecture and compromise. Are their principles and their patterns eternal verities Í The answer is, no! They are the best postulates so far attainable. “ It is only by trial and error, by insistent scrutiny and by readiness to re-examine presently accredited conclusions that we have risen, so far as in fact we have risen, from our brutish ancestors, and in our loyalty to these habits lies our only chance, not merely of progress, but even of survival.” (Hon. Learned Hand in “A Plea for the Freedom of Dissent ”.) And, it will be forever thus!
Dr. Sidney Hook, Professor of Philosophy in the defendant’s school, in a recently published article suggests an eight-point *229 outline for action “ to preserve and restore peace on the campuses.” The proposed features include a convocation of university faculty, students, and administrators to draft guidelines for the expression of dissent on campuses, with rules stating the kinds of conduct and behavior considered legitimate dissent. It includes a faculty-student discipline committee to police it.
“Unrest is not a problem, but a virtue”, said Dr. Hook (supra), “if it is related to the pursuit of an education, to interest in ideas and beliefs ”.
Indeed, in an effort to improve relations between students and faculty, in a situation of persistent smouldering uneasiness which was then permeating its campuses’ atmosphere, Kent State University instituted a program two years ago in which faculty members visited dormitories for informal discussions with students. This program was dropped soon thereafter for lack of faculty interest. The court shudders to wonder if the catastrophe which befell that college campus soon thereafter might not have been averted had this program been pursued.
Unfortunately, the zeal to reform by nationwide faculties has never yet satisfied itself by coming up with any single reform which could be interpreted as at the expense of faculty privilege (Professor Irving Kristol in an article recently appearing in the New York Times).
It is this court’s opinion that the defendant, like many others similarly situated in this country, has not made a good-faith attempt to solve genuine and long-standing problems within its own college communities. For the third time in as many months, our Chief Executive has asserted that the university community itself bears the responsibility for restoring “ order and discipline ”, and “ an atmosphere in which free academic inquiry can flourish on college campuses ’ ’.
College administrators have yielded too easily to the demands of campus dissidents and have thereby ushered in an era of intellectual and physical intimidation, thus corrupting the purposes of the university. (Dr. Hook, supra.)
There can be no substitute for the acceptance of responsibility for order and discipline on campuses by college administrators and college faculties. They' should not engage in adversary confrontations with students, but in thoughtful exchange of ideas. This is not accomplished by canceling classes and closing down school facilities, for this constitutes a pcmic reaction to avoid violence and bloodshed instead of a planned action to be a responsible force in social change. There has been a complete abdication by the defendant’s administrators in this instance in that they have failed to maintain the discipline and *230 order necessary for the safety of their students and for the maintenance of an atmosphere in which learning can take place; but, more importantly, in that they have failed to gauge the tenor of contemporary social movements to be able, as is the function entrusted above all to the university, with sufficient foresight, sensitivity, honesty, and courage in the consideration of these developments, to help, guide, and give direction to our society, and to do so with the full democratic participation of the students. To expect students to develop loyalty and commitment to democratic principles when, in the ideal situation of intellectual exchange in the university, they have a voice neither in the governance of their behavior nor the proper guidance in correct, effective ways of expressing thoughts on such vital issues as the survival of the individual, of the Nation, and of humanity, and to offer by way of consolation the fact that they have ‘ ‘ passed ’ ’ courses, for which they have received grades, the symbols, not the substance of knowledge, is to disappoint the hopes of students, of parents, and of the Nation.
The situation was, and still is, on many campuses in the country, violent and chaotic, principally because there are no guidelines between permissible constituted student protest and unlawful action.
No cause justifies violence in the name of change. There has been too much negative focus in fixing the blame for campus unrest on the shoulders of .students; and to ascribe the action of defendant’s senate primarily to such campus unrest is to torture logic to connect cause to effect.
Human nature is malleable, especially if the disciple can be indoctrinated 'with indefectible principles before anyone can reach him.
For ‘ ‘ They never would hear, But turn the deaf ear, As a matter they had no concern in ”. (Dingley and Brent, ii.)
The challenge is now for everyone to earn some credit for effecting overdue .reforms. Let there be a dialogue between the frustrated and the deaf!
The defendant contends further that it is insulated from legal liability in this case because it may make “all * * * rules necessary and proper for the purposes of the institution and not inconsistent with law or any rule of the university ”.
It offers in evidence a bulletin which is delivered to all students at the time of their enrollment wherein it is stated * ‘ That the programs and requirements are subject to change without notice at any time at the discretion of the administration ”.
To argue that this rule contemplated, envisioned, and/or in any way intended the closing of classes scheduled, to attend *231 which students had already paid tuition, and the suspension of the balance of the semester is too specious to merit any consideration.
Moreover, assuming that the defendant’s senate took the afore-stated action before the semester had begun, or during the early part of the semester instead of the last month, could it thereby have successfully contended that because of the invoked rule the students would not be entitled to a return of their tuition?
The principle of law is the same. The defendant breached its contract during its lifetime. It matters not in what point in its duration.
The court finds neither form nor substance in defendant’s denial of liability in this breach of contract suit.
Let judgment be entered in favor of the plaintiff and against the defendant in the sum of $277.40 with interest from May 6, 1970, and costs.